LIH, by and on behalf of her minor son, LH et alia, Plaintiffs,

v.

**NEW YORK CITY BOARD OF EDUCATION et alia, Defendants.**

No. CV–00–3876 (CPS).

United States District Court, E.D. New York.

July 17, 2000.

Elisa F. Hyman, Advocates for Children, New York City, for plaintiffs.

Daniel McCray, Asst. Corp. Counsel, New York City, for defendants.

## MEMORANDUM AND ORDER

SIFTON, Senior District Judge.

Plaintiffs LIH, by and on behalf of her minor son, LH; LM, by and on behalf of her minor son, MV; OL, by and on behalf of her minor son, ML; LR, by and on behalf of her minor daughter, MS; and JW, by and on behalf of her minor daughter AW, individually and on behalf of others similarly situated, bring this action against defendants the New York City Board of Education ("Board") and Harold Levy, Chancellor of the New York City public schools. Plaintiffs allege that defendants' policy governing the suspension of disabled children attending summer school within the New York City public school system deprives those children of their rights under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400 *et seq.*, the Due Process Clause of the Fourteenth Amendment, Section 504 of the Rehabilitation Act of 1974, 29 U.S.C. § 794, New York State Education Law, and Chancellor's Regulation A–445.[1] Currently before the Court is

plaintiffs' application for a preliminary injunction preventing defendants from implementing the Board's policy governing the suspension of students with disabilities attending summer school during the year 2000 summer session.

For the reasons set forth below, plaintiffs' application for a preliminary injunction is granted in accordance with the separate order filed herewith. What follows sets forth the findings of fact and conclusions of law on which the decision to grant a preliminary injunction is based, as required by Rules 64 and 65 of the Federal Rules of Civil Procedure.

## BACKGROUND

The following facts are taken from the submissions of the parties in connection with the instant applications. Since the underlying facts are essentially undisputed, no evidentiary hearing is required. *See Brown v. Giuliani,* 158 F.R.D. 251, 254 (E.D.N.Y.1994). That is not to say that the parties do not dispute the inferences to be drawn from some of those underlying facts. The resolution of those differing inferences is, however, a matter of argument and, the parties agree, would not be assisted by an evidentiary hearing. *See Drywall Tapers & Pointers of Greater New York, Local 1974 v. Operative Plasterers' & Cement Masons' Int'l Ass'n of U.S. & Canada,* 537 F.2d 669, 674 (2d Cir.1976).

In the New York City public school system, certain students who do not meet the criteria for promotion to the next grade during the regular school year are required[2] to attend summer school as a condition for promotion. Among those stu-

---

1. Plaintiffs make additional claims in their First Amended Complaint under Section 504 that have no bearing on the present application for preliminary relief.

2. Although defendants take the position that attendance at summer school is not "required," it is apparent that the named plaintiff children, at least, have no other way, as a practical matter, of preparing for the tests that will determine their eligibility for pro-

motion. Moreover, as noted below, the defendants have in their communications with plaintiffs treated summer school as a requirement for promotion. For these and other reasons discussed below, I infer that attendance at summer school is, as a practical matter, required in order for the plaintiff children to be promoted to a new grade and so continue their education.

dents who will attend summer school are thousands of students with disabilities who are currently enrolled in special education programs. Plaintiffs purport to represent the class of students with disabilities who are attending or will attend summer school this summer. The named plaintiffs attend school in Brooklyn, Queens, and Manhattan.

Plaintiff LIH brings this action on behalf of her son, LH, a seventh grade student in the New York City public school system who suffers from attention deficit disorder and central auditory processing disorder.[3] LH, as a student with a disability eligible for special education services under the IDEA and Section 504, currently receives speech therapy, counseling, and assistance from a paraprofessional on how to modify his behavior. During the regular school year, he attends a Modified Instructional Setting ("MIS") class, a class of similarly situated students in which the regular curriculum is modified to meet the students' particular disabilities. LH has been suspended from school five times since October 1998. During the 1999 summer school session, LH was suspended after several days and was not allowed to return. LH was scheduled to begin summer school on July 5, 2000, and his promotion to the eighth grade as a practical matter hinges upon the successful completion of the summer school program. During the summer term, however, LH will not receive paraprofessional or other support services,[4] and if he does not behave he runs the risk of not completing summer school.

Plaintiff LM brings this action on behalf of her son, MV, an eight-year-old second grade student in the New York City public school system. MV, as a student with a disability eligible for special education services under the IDEA and Section 504, currently receives small group "resource room" instruction to help him maintain his reading abilities, which suffer due to his learning disability. On July 5, 2000, MV was scheduled to begin summer school, and his promotion to the third grade is as a practical matter contingent upon the successful completion of summer school.

Plaintiff LR brings this action on behalf of her daughter, MS, a fifth grade student in the New York City public school system. MS, as a student with a disability eligible for special education services under the IDEA and 29 U.S.C. § 794, currently receives resource room instruction to help her cope with her learning disability. On July 5, 2000, MS will begin summer school, and her promotion to the sixth grade is as a practical matter contingent upon the successful completion of summer school.

Plaintiff JW brings this action on behalf of her daughter, AW, a six-year-old first grade student in the New York City public school system with a learning disability. AW, as a student with a disability eligible for special education services under the IDEA and Section 504, currently receives resource room instruction and other spe-

---

**3.** The auditory process refers to the roughened edge of the tympanic plate (a bony plate between the anterior wall of the external acoustic canal and the posterior wall of the mandibular fossa, or the deep hollow in which the mandible rests) giving attachment to the cartilaginous portion of the external acoustic meatus (canal). *See* Steadman's Medical Dictionary 1140 (5th ed.1982). LH takes Ritalin for attention deficit disorder.

**4.** Defendants state that these services (such as MIS classes and speech services) are not provided during the summer for students with disabilities unless they are in a twelve-month program. New York State law only requires the provision of these services between September and June unless the student's disabilities are severe enough to require a structured learning environment of twelve months in order to maintain developmental levels. *See* N.Y. Educ. Law § 4402(2)(a). Defendants further state that they do not receive IDEA reimbursements from the state or federal governments for any services provided to students over the summer unless the students are part of the "extended school year" ("ESY") program under § 4402(2)(a). The lack of these services during the summer is, however, not directly at issue on this application.

cial education services, based on behavioral problems related to her disability, including attentional and behavioral difficulties. Her teachers have described her as impulsive and restless and say that she exhibits a significant degree of oppositional and limit-testing behavior. Her teacher has recommended that AW receive a crisis management paraprofessional to help manage her behavior, and her Individualized Education Plan ("IEP") includes a behavior intervention plan. AW was set to begin summer school on July 5, 2000, and her promotion to second grade is as a practical matter contingent upon the successful completion of summer school. She will not receive any specialized assistance from a paraprofessional to help her deal with her behavior during the summer term.

Plaintiff OL brings this action on behalf of her son, ML, a fourteen-year-old ninth grade student in the New York City public school system.[5] ML has been diagnosed as an emotionally disturbed student and is receiving special education services under the IDEA and Section 504, including an MIS class. During the regular school year, he attends a class of twelve students, supervised by both a teacher and a paraprofessional. He also receives counseling at school to help him achieve his emotional and behavioral goals. ML's IEP states that he is at times unable to accept the consequences of his actions and has difficulty accepting direction from authority. ML has been suspended at least two times in the past year, for a total of approximately nine days. He has been mandated to attend summer school this summer to make up credits without which he will not be promoted to the tenth grade. ML will receive none of these special services during the summer.

Defendant New York City Board of Education ("Board") is the local official body charged with developing policies concerning the administration and operation of the public schools in the City of New York. See N.Y. Educ. Law §§ 2590, 2590–g. The Board is a recipient of federal financial assistance and constitutes the "local educational agency" ("LEA") for New York City as defined in IDEA. See 20 U.S.C. § 1401. Defendant Harold Levy is sued in his capacity as the Chancellor of the New York City public schools. The Chancellor is required, inter alia, to control and operate all special education programs and services mandated by the Board. See N.Y. Educ. Law § 2590–h.

Defendants recently instituted a new promotional policy under which all children must meet certain promotional criteria to be promoted to the next grade, or face being "held over."[6] The new policy requires teachers to make a professional judgment about a student's readiness to be promoted to the next grade based on three criteria: (1) coursework, as evidenced by classwork, teacher observation, and term grades; (2) attendance; and (3) standardized test performance. Promotion decisions are based on a consideration of these three criteria together, and no single criterion is determinative. (Chaifetz Reply Aff. Ex. A at 3–4.) Those students not meeting the promotional criteria at the end of the regular school year are sent notices instructing them to attend a "mandated"

---

**5.** Plaintiff ML was added by the First Amended Complaint, which was filed on July 12, 2000, six days after oral argument was held on the present application.

**6.** The new promotional standards, including the ending of a practice commonly known as "social promotion," were approved by the Board on September 8, 1999, and implemented by Chancellor's Regulation A–501. (Chaifetz Reply Aff. Ex. A at 3 & Ex. B.) This change in policy led to an unprecedented increase in the number of students attending summer school. The new policy, however, explicitly exempted children with disabilities who were not enrolled in twelve-month schooling. The "Guidelines for Determining Promotion Criteria for Students with Disabilities Receiving Special Education Services" described below made the new standards applicable to those children with disabilities, such as plaintiffs ML and MS, whose IEPs had been revised during the 1999–2000 school year to reflect the new standards.

summer school program.[7] The summer program began on July 5, 2000, and is a 100–hour, five- to six-week program. Summer school is mandated for some of the children in the putative class because they failed to meet the new citywide promotional standards.

Defendants assert that attendance at summer school is not technically required for promotion to the next grade since promotion is contingent only upon the student's score on a standardized test administered at the end of the summer that all "held-over" students are permitted to take, regardless of their attendance at summer school. Defendants characterize summer school as an "optional" remedial program. It is clear, however, that defendants have decided that summer school instruction for held-over students is of vital educational importance and crucial to these students' potential for promotion. The Chancellor's Summer School Status Report 2000, issued on May 3, 2000, states that summer school is an "integral part of the Board Promotion Policy." (Chaifetz Reply Aff. Ex. A at 16.) The report explains:

> Successful completion of Summer School 2000 will, for many students, be the critical factor in determining their promotion. The fact that attendance in summer school will have a direct impact upon whether students are promoted to the next level of achievement makes the tracking and follow up of their attendance an important component of the overall program.

(Chaifetz Reply Aff. Ex. A at 10.) [8]

Under the "Guidelines for Determining Promotion Criteria for Students with Disabilities Receiving Special Education Services" promulgated by defendants, only students who have had their IEPs revised between November 1999 and January 31, 2000, to reflect whether the new promotional criteria will apply to them will be held to the new criteria and be required to attend summer school. (*See* Chaifetz Aff. Ex. A.) Plaintiffs aver, however, that "hundreds if not thousands" of students throughout the city are being "held over" for grade promotion pending mandatory attendance at summer school who should not be because their IEPs were not revised in time. (Chaifetz Aff. ¶ 16.) Other children have been offered the opportunity to attend summer school voluntarily because they are not meeting the general promotional criteria, but the criteria do not yet apply to them under the guidelines.

The present dispute arises from defendants' alleged institution of new disciplinary procedures governing the suspension of children with disabilities who attend summer school.[9] Chancellor's Regulation

---

7. Although, as already noted, defendants insist that summer school is not required for any student, the notices sent by defendants to plaintiffs in this case use mandatory language: "By now you have heard that you will *have* to go to summer school," (Chaifetz Aff. Ex. B (emphasis added)); "Please be informed that the Chancellor's District will be implementing a Mandated Summer Program for students currently in Grades 3–7, who are in need of extra academic support. This required program is designed to reflect the new promotional policy.... Please be advised that your child is *required to attend* to be considered for promotion to the next grade in September, 2000," (*id.* Ex. C (emphasis added)). Plaintiffs also aver, and defendants do not dispute, that many potential class members were informed verbally that the summer session was mandatory. (*Id.* ¶ 17.)

8. Indeed, the Chancellor states in the report that he finds attendance at summer school to be so important to the education of "mandated students," i.e., those who are held-over, that he intends "to seek the Board's authorization, as a policy matter, to petition the State Legislature to extend the compulsory education law to mandated summer school students." (Chaifetz Reply Aff. Ex. A at 11.)

9. These alleged changes have occurred in the context of a broad "decentralization" of disciplinary procedures for students with disabilities. Historically, the community school districts were responsible for the suspension of general education students in elementary and middle schools, and the Central Board handled suspensions of all special education and high school students. The new plan would devolve all responsibility for suspensions of students with disabilities in the community

A–445 ("A–445") outlines the procedures governing the suspension of students with disabilities. Plaintiffs maintain that this regulation remains in effect for summer school students, while defendants contend that it has never been applied to summer school and that the new decentralized process now obtains. A–445, encompassing approximately sixty pages of detailed regulations, mandates that every student facing a suspension of five days or less has a right to have an investigation and hearing in the student's school, the outcome of which may be appealed. Students facing suspension of more than five days receive a hearing at the central hearing office of the Board and may appeal the determination of the hearing officers, all of whom are attorneys.

For the upcoming summer school session, which commenced on July 5, 2000, defendants plan to disregard A–445 and implement an alternative plan (the "summer policy") for the suspension of students with disabilities. In general under the summer policy, local principals or site supervisors will have discretion to impose disciplinary action, and students will have no right to an appeal of their decisions. The discipline policy for students in summer school was disseminated by memorandum dated April 3, 2000, from Francine Goldstein, Supervising Superintendent, and John Musico, Superintendent for Promotional Policy, to all superintendents. In relevant part, the policy states:

1. School staff, students and parents must be advised that the standards of conduct (but not the dispositions) set forth in the Discipline Code apply to students who attend summer school....

2. When an incident of misbehavior occurs, the principal, site supervisor or designee shall conduct an investigation (interview witnesses to and participants in the incident, including the accused, and ask them to provide signed written statements) in order to determine what occurred and what, if any, disciplinary action should be taken. The principal or site supervisor may elect to impose any of the following disciplinary actions: reprimand the student, impose in-school disciplinary action, seek restitution, refer the student for counseling or other services, have a conference with the student and/or parent, remove the student from the program for up to two days or expel the student from the summer program.

3. Students who are removed for up to two days or expelled from the program must be afforded an appropriate level of due process, i.e., written notice to the student and parent of the misbehavior and the opportunity to discuss the matter with an appropriate school official at an expedited guidance conference.

4. In imposing any level of discipline, the principal must consider the student's age, maturity and prior disciplinary record as well as the circumstances surrounding the incident.

5. If the student is subjected to short-term removal or expulsion and is attending summer school in order to achieve a passing score on the standardized tests to be administered at the end of the program, the student will be permitted to take the tests, though not necessarily at the school he/she attended.

6. There shall be no appeal[10] of any decision to discipline a student during

school districts to the district level by September 2000. Defendants are in the process of revising Chancellor's Regulation A–445 to achieve this decentralization. Suspensions for disabled students in District 75 (Citywide Special Education), District 85 (the Chancellor's District), and high schools will remain centralized. The legality and constitutionality of this plan for the regular school year was the subject of a related lawsuit, *Doe v. Board of Educ.,* CV–81–0197 (CPS).

**10.** In their opposition brief, however, defendants state that summer school students have the right under state law to appeal their sus-

summer school, including short-term removal or expulsion. Students who are removed or expelled shall be marked absent.

These guidelines do not apply to District 75 twelve-month programs.[11]

(Chaifetz Aff. Ex. G, sub Ex. D.) Significantly, this disciplinary procedure makes no effort to determine whether the proscribed behavior was a manifestation of the student's underlying disability. Despite the stated policy that summer school is of critical educational importance, defendants will not provide suspended or expelled students with any alternative instruction to enable them to pass these exams or complete missing coursework required for promotion.[12]

Plaintiffs note that the Special Education Suspension and Hearing Offices, which conduct the centralized disciplinary hearings under A–445, will remain open during the summer since the A–445 procedures remain in effect for all 13,000 to 15,000 of the severely disabled children in District 75 (Citywide Special Education) who receive twelve-month extended services. It is also uncontested that there will be no summer staff reduction at these central offices. (*Id.* Ex. H ¶ 9.)

Plaintiffs argue that defendants' new summer school suspension policy and their failure to adhere to the procedures outlined in A–445 violate the IDEA, 29 U.S.C. § 794, the Due Process Clause of the Fourteenth Amendment, Section 504 of the Rehabilitation Act of 1974, and New York State Education Law. Defendants contend that the summer program does not implicate students' rights to a statutorily guaranteed right to a free education, but in-

stead involves mere access to a voluntary remedial program and that for that reason they need not comply with IDEA.

## DISCUSSION

■ Plaintiffs move for a preliminary injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure, requiring defendants to afford to disabled students during the summer program the procedural protections in A–445 and IDEA. A preliminary injunction is appropriate if the moving party demonstrates "(a) irreparable harm, and (b) either (1) a likelihood of success on the merits, or (2) sufficiently serious questions going to the merits to make them fair grounds for litigation and a balance of hardships tipping decidedly in its favor." *Genesee Brewing Co. v. Stroh Brewing Co.*, 124 F.3d 137, 142 (2d Cir. 1997). Injunctive relief cannot be granted unless the party can satisfy both prongs of the test. *See, e.g., PDL Vitari Corp. v. Olympus Indus., Inc.*, 718 F.Supp. 197, 203 (S.D.N.Y.1989).

### *Irreparable Harm*

■ The showing of irreparable harm is the "single most important prerequisite for the issuance of a preliminary injunction," *Bell & Howell Mamiya Co. v. Masel Supply Co.*, 719 F.2d 42, 45 (2d Cir.1983), and the movant must show that injury is likely before the other requirements for an injunction will be considered. Irreparable harm must be shown to be "likely and imminent, not remote and speculative," and the injury must be such that it cannot be fully remedied by monetary damages. *NAACP v. Town of East Haven*, 70 F.3d 219, 224 (2d Cir.1995); *see also JSG Trad-*

---

pensions to the State Education Commissioner. *See* N.Y. Educ. Law § 310(7).

**11.** District 75 is a citywide district that provides instruction to approximately 13,000 to 15,000 children with the most severe disabilities. Many of these children receive twelve-month or extended-year special education services in segregated classrooms. (Chaifetz Aff. ¶ 42.)

**12.** I note that this failure may constitute a violation of 34 C.F.R. §§ 300.121(d) & 300.520(a)(2), which require the provision of services sufficient to effect a "free appropriate public education" when a child with disabilities is removed for more than ten days in the school year. The provision of these services, however, is not at issue in this application for preliminary relief.

*ing Corp. v. Tray–Wrap, Inc.*, 917 F.2d 75, 79 (2d Cir.1990) (holding that "possibility" of harm is insufficient).

■ In this case, the plaintiffs argue that the irreparable harm which will occur is the erroneous suspension of students for conduct that the proper procedural safeguards would have discerned was related to a student's disability and, therefore, should not have resulted in the discipline imposed. The defendants do not dispute the likelihood of this harm—that inevitably over the course of the summer students with disabilities will be suspended without the procedural protections afforded by IDEA and A–445 with the risk that the discipline was inappropriately imposed in some cases.[13] Nor do they dispute that this harm meets the requirements of irreparable injury sufficient to grant a preliminary injunction. In any event, it is clear to this Court that the harms resulting from the defendants' failure to follow the statutorily required procedures for the imposition of discipline on students with disabilities creates a substantial likelihood of irreparable injury.

Given the high likelihood of disciplinary problems involving students with disabilities, it cannot be argued that the application of the defendants' disciplinary procedures in place during summer school present a speculative injury. An erroneous suspension and resulting exclusion of students with disabilities during summer school will result in the failure of such students to be promoted to the next grade when the school year begins in September. Should disabled students be erroneously excluded from summer school and forced to repeat their prior grade, the harm they will suffer will be irreparable. No level of monetary damages could possibly compensate these students for the educational opportunities they will lose; monetary damages cannot supply the grade promotion lost to a student excluded from the summer school program. *See Goss v. Lopez*, 419 U.S. 565, 581 n. 10, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975).

### *Likelihood of Success on the Merits*

■ Plaintiffs have also shown that they are likely to succeed on the merits of their argument that, with respect to student discipline, the Board of Education is governed by the IDEA and A–445, and the student disciplinary procedures which have been implemented for summer school do not comport with the requirements found in either.

Congress enacted the IDEA "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs ... [and] to ensure that the rights of children with disabilities and parents of such children are protected...." 20 U.S.C. § 1400(d)(1)(A) & (B). A "free appropriate public education" ("FAPE") is defined as special education and related services that: (1) are provided under public supervision and at public expense without cost to parents; (2) meet the standards of the state educational agency; (3) include an appropriate preschool, elementary, or secondary school education; and (4) are provided in conformity with the individualized education program required by § 1414(a)(5) of the Act. *See* 20 U.S.C. § 1401(a)(18).

To receive funds from a state educational agency, local educational agencies such as the Board must provide assurances that they will develop an "individualized edu-

---

**13.** On July 14, 2000, plaintiffs requested leave to file a supplemental affidavit based on events that occurred after the deadline for submissions related to the present application. The affidavit relates that LS, a student claiming disabilities, was expelled from summer school without any procedural protections whatsoever. It is undisputed that LS has been allowed to return to school. Defendants have objected to this submission even though the Court specifically solicited information on any such developments. In any event, the Court has not considered this new affidavit in the present decision, and as such, resolution of the parties' procedural dispute concerning the affidavit is not necessary.

cation program" ("IEP") for each child with a disability at the beginning of each school year and will review and, if appropriate, revise the IEP's provisions periodically, but not less than annually. *See* 20 U.S.C. §§ 1401(a)(20), (5). The IEP is a written statement developed through a meeting of an "IEP team" consisting of a representative of the local educational agency, the child's teacher, the child's parent or guardian, and, when appropriate, the child.[14] *See* 20 U.S.C. § 1401(a)(20).

In order to achieve this goal of a FAPE for all children with disabilities, the IDEA requires that the states comply with extensive procedural requirements and safeguards in order to receive federal funds for use in special education programs. *See* 20 U.S.C. § 1415. Section 1415(a) explicitly states

> Any State educational agency, State agency, or local educational agency that receives assistance under this subchapter shall establish and maintain procedures in accordance with this section to ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of free appropriate public education by such agencies.

*Id.* In *Board of Education v. Rowley*, 458 U.S. 176, 201, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982), the Supreme Court held that the IDEA contained a federal minimum standard, a "basic floor," of beneficial education.

In this case, the relevant requirements of the IDEA, found in 20 U.S.C. § 1415(k),

concern the placement of disabled students in alternative educational settings as a result of the imposition of discipline. It is undisputed that defendants' summer disciplinary policy does not meet the minimal requirements found in the IDEA, 20 U.S.C. § 1415(k), and supporting regulations, 34 C.F.R. 300.519–300.529. The protections afforded under IDEA attach when school authorities effect a "change of placement" removal, which occurs when a child with a disability, or a child claiming IDEA protection who qualifies under 20 U.S.C. § 1415(k)(8),[15] is subjected to (1) a removal for more than ten consecutive school days or (2) a series of removals that constitute a pattern because they cumulate to more than ten school days in a school year and because of factors such as the length of each removal, the total amount of time the child is removed, and the proximity of the removals to one another. *See* 34 C.F.R. § 300.519.

When a change in placement removal is contemplated for a child with a disability, then no later than the date on which the removal decision is made the parents must be notified of the decision and of all procedural safeguards afforded under IDEA. *See* 20 U.S.C. § 1415(k)(4)(A). Moreover, the local educational agency ("LEA") must review the disciplinary action to determine the relationship between the behavior subject to the disciplinary action and the child's disability. *See id.;* 34 C.F.R. § 300.523. Following the parental notification, "a review must be conducted of the relationship between the child's disability

---

**14.** The IEP must include: (1) a statement of the child's present levels of educational performance; (2) a statement of annual goals, including short-term objectives; (3) a statement of the specific educational services to be provided to the child and the extent to which the child will participate in regular educational programs; (4) a statement of the needed transition services for students beginning no later than age 16 and annually thereafter; (5) the date for the initiation and duration of the educational services; and (6) objective criteria and evaluation procedures and schedules for determining, at least annually, whether

the instructional objectives are being achieved. *See* 20 U.S.C. § 1401(a)(20).

**15.** This subsection provides that the IDEA protections will apply to children who have not been determined to be eligible for special education and related services if the local educational agency had knowledge, as determined in accordance with the standards detailed in the subsection, that the child was a child with a disability before the behavior that precipitated the disciplinary action occurred. *See* 20 U.S.C. § 1415(k)(8).

and the behavior subject to the disciplinary action." 34 C.F.R. § 300.523(a)(2). That review must be "conducted by the IEP team and other qualified personnel in a meeting." 34 C.F.R. § 300.523(b). It may be determined that the behavior of the child was not a "manifestation of the child's disability" if the IEP team and other qualified personnel

(1) First consider, in terms of the behavior subject to disciplinary action, all relevant information, including

(i) Evaluation and diagnostic results, including the results or other relevant information supplied by the parents of the child

(ii) Observations of the child;

(iii) The child's IEP and placement; and

(2) Then determine that

(i) In relationship to the behavior subject to disciplinary action, the child's IEP and placement were appropriate and the special education services, supplementary aids and services, and behavior intervention strategies were provided consistent with the child's IEP and placement;

(ii) The child's disability did not impair the ability of the child to understand the impact and consequences of the behavior subject to disciplinary action; and

(iii) The child's disability did not impair the ability of the child to con-

trol the behavior subject to disciplinary action.

34 C.F.R. § 300.523(c)(1) & (2). If the IEP team and other qualified personnel determine, however, that "any of the standards in paragraph (c)(2) ... were not met, the behavior must be considered a manifestation of the child's disability." *Id.* § 300.523(d). If the behavior is determined to be a manifestation of disability, then the discipline was improper.

The IDEA also provides for the right to appeal this determination: "[i]f the child's parent disagrees with a determination that the child's behavior was not a manifestation of the child's disability ..., the parent may request a hearing." 34 C.F.R. § 300.525(a)(1). Furthermore, the "State or local education agency shall arrange for an expedited hearing ... if a hearing is requested by a parent."[16] 34 C.F.R. § 300.525(a)(2).

In addition, within ten business days after the actual removal:

(i) If the LEA [local education agency] did not conduct a functional behavioral assessment and implement a behavioral intervention plan for the child before the behavior that resulted in the removal ..., the agency shall convene an IEP meeting to develop an assessment plan.

(ii) If the child already has a behavioral intervention plan, the IEP team shall meet to review the plan ... and

---

**16.** An expedited hearing is defined in 34 C.F.R. § 300.528. That section states that the hearing must meet the requirements of § 300.509, except that the time periods identified in §§ 300.509(a)(3) and (b) are not less than two business days, and the hearing officer must meet the requirements of § 300.508. Section 300.509, in relevant part, provides:

Any party to a hearing ... has the right to
(1) Be accompanied and advised by counsel and by individuals with special knowledge or training with respect to the problems of children with disabilities;
(2) Present evidence and confront, cross-examine, and compel the attendance of witnesses

(3) Prohibit the introduction of any evidence at the hearing that has not been disclosed to that party at least 5 business days before the hearing;
(4) Obtain a written, or ... electronic, verbatim record of the hearing; and
(5) Obtain written, or ... electronic findings of fact and decisions.

Section 300.508(a) provides that a hearing may not be conducted "[b]y a person who is an employee of the State agency or the LEA that is involved in the education or care of the child" or "[b]y any person having a personal or professional interest that would conflict with his or her objectivity in the hearing."

modify the plan ... to address the behavior.

34 C.F.R. § 300.520. Further, the assessment plan developed by the IEP team shall be implemented as soon as practicable. *See id.* Section 300.520 further provides:

(1) If subsequently, a child with a disability who has a behavioral intervention plan and who has been removed from the child's current educational placement for more than 10 school days in a school year is subjected to a removal that does not constitute a change of placement ... the IEP team members shall review the behavioral intervention plan ... to determine if modifications are necessary.

(2) If one or more of the team members believes that modifications are needed, the team shall meet to modify the plan ... to the extent the team determines necessary.

*Id.*

 In this case, moreover, because the relevant state regulations embodied in A–445 are more protective of students with disabilities than IDEA, the federal statute requires the Board to meet these heightened procedural protections. While the IDEA establishes a basic floor of education, state law may mandate a more protective standard of educational services and procedural protection. In such cases, the IDEA provides that a federal "free appropriate public education" must "meet the standards of the State educational agency." 20 U.S.C. § 1401(18)(B); *see also Rowley,* 458 U.S. at 203, 102 S.Ct. 3034. Accordingly, the IDEA "incorporates by reference state standards, be they substantive or procedural, that exceed the federal basic floor of meaningful, beneficial educational opportunity." *Burlington v. Dep't of Educ.,* 736 F.2d 773, 789 (1st Cir.1984). Furthermore, an agency like the Board must follow procedures required by its own regulations, even if these regulations were not statutorily or constitutionally mandated. *See United States v. Nix-*

*on,* 418 U.S. 683, 694–95, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974). Indeed, "[i]t is axiomatic that an agency is legally bound to respect its own regulations and commits procedural error if it fails to abide by them." *Benten v. Kessler,* 799 F.Supp. 281, 290 (E.D.N.Y.1992) (internal citations and quotations omitted).

In New York City, to comply with its obligations under the IDEA with respect to student discipline, the Board enacted Chancellor's Regulation A–445. A–445 explicitly states that it "delineates each step to be followed in suspension proceedings and sets forth the due process rights of students, as required by the Individuals with Disabilities Education Act." *See* Regulation of the Chancellor No. A–445, Sept. 5, 1995. Among the requirements found in A–445 are the rights to an impartial hearing, to review and present all evidence, to confront witnesses, to have a review to determine if the conduct was a manifestation of his/her disability or return to school after ten days, and to appeal decisions.

It is clear that A–445 mandates more procedural protections than IDEA itself. The IDEA disciplinary procedures relate only to suspensions of more than ten days, including cumulative removals in a school year, whereas A–445 has the IDEA protections and prescribes stiffer due process protections for lesser suspensions. A–445, in addition to mandating manifestation evaluations and full hearings for suspensions of more than ten days, contains strict procedural requirements for suspensions of one to five days, termed Principals' Suspensions. A–445 requires that the parents of a student be notified immediately about the suspension. Furthermore, that notice must provide a statement of the student's rights, including the right to (1) question persons involved in the incident, (2) request and present witnesses and documentary evidence, (3) be accompanied by up to two advisors, (4) be returned to the school at the end of the suspension, and (5) appeal the suspension decision. Students suspended for five days also have the right

to a hearing at the central hearing office. In addition, A–445 requires a hearing concerning a suspension of more than ten days to occur within five days following the suspension, as opposed to the ten-day deadline in the IDEA. As these procedures go substantially beyond the protections of § 1415(k), this Court will treat A–445 as incorporated by reference into the IDEA. *See supra.*

Defendants do not attempt to argue that the procedures concerning the imposition of discipline to be implemented during summer school meet the requirements of A–445 or the IDEA. In fact, defendants admit that virtually none of the requirements found in the IDEA and A–445 will be followed in imposing discipline during summer school. Instead, students who are suspended for two days or expelled are entitled only to a written notice and a minimal "opportunity to discuss the matter with an appropriate school official at an expedited guidance conference." (Chaifetz Aff. Ex. G, sub Ex. D.) Although defendants themselves appear confused about the availability of appeals, it is clear that no appeal to Board personnel as required by A–445 is permitted. Moreover, there is no provision whatsoever for a manifestation review in the event of suspensions of more than ten days or expulsion. Indeed, the summer school disciplinary policy clearly violates both IDEA and A–445.

Defendants instead argue that the procedural prescriptions of IDEA and A–445 are simply inapplicable to the summer school program. Defendants contend that the only procedure required for the impo-

sition of discipline during summer school— and the only procedure that will be given to students with disabilities attending summer school—is the basic requirements of constitutional due process, i.e., notice and an opportunity to be heard. *See Goss,* 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725.

In support of this argument, defendants first assert that the IDEA and A–445, by their terms, were never meant to apply to "purely voluntary" programs such as the summer school program. Defendants argue that the five- to six-week summer program is completely optional, not part of the ten-month educational program that State law makes mandatory, and that the IDEA applies only to those educational programs made mandatory. Defendants accordingly attempt to label summer school as an "extra-curricular" program, explicitly equating it to after-school athletics. Because the program is non-compulsory, defendants argue, the procedural protections of IDEA and A–445 do not attach, and defendants must only comply with basic considerations of due process.

■ As an initial matter, Congress has unequivocally stated that the extensive disciplinary protections in the IDEA obtain during every "school day," defined as "any day, including a partial day, that children are in attendance at school for instructional purposes." 34 C.F.R. §§ 300.9, 300.519–300.529. There can be no question that the summer school program here qualifies under this definition.[17]

Nor can it be maintained that a summer school program thought to be "integral" to their promotion policy is similar to playing

---

**17.** Defendants argue that IDEA's reference to the "school year" when discussing the procedural protections proves that Congress did not intend to require compliance with Section 1415(k) during summer school. Neither IDEA nor its supporting regulations, however, ever defines "school year." When considered in conjunction with the explicit definition of "school day," which clearly encompasses attendance at a summer school program, and the broad remedial purpose of the statute, defendants' argument borders on the absurd. *See Atchison, Topeka & Santa Fe Ry. Co. v.*

*Buell,* 480 U.S. 557, 562, 107 S.Ct. 1410, 94 L.Ed.2d 563 (1987) (when interpreting broad remedial statutes, courts should apply a "standard of liberal construction in order to accomplish [Congress'] objects"); *Urie v. Thompson,* 337 U.S. 163, 180, 69 S.Ct. 1018, 93 L.Ed. 1282 (1949); *E.E.O.C. v. Staten Island Savings Bank,* 207 F.3d 144, 149 (2d Cir.2000) (holding that "it is our duty to interpret remedial statutes broadly," and interpreting the ADA); *Heilweil v. Mount Sinai Hosp.,* 32 F.3d 718, 722 (2d Cir.1994) (same, interpreting Rehabilitation Act).

for one's high school baseball team. The idea that an educational program as important as summer school as a basis for promotion to the next grade is an extra-curricular activity when it comes to individuals with disabilities hearkens back to a time when such "children were excluded completely from any form of public education or were left to fend for themselves in classrooms designed for education of their nonhandicapped peers." *Rowley*, 458 U.S. at 191, 102 S.Ct. 3034. Whether children are in this program voluntarily is as irrelevant to the question of whether summer school is part of their education as the fact that sixteen to twenty-one year olds attend school voluntarily is to the question of whether such voluntary attendance is part of their education.

Summer school education for struggling students is intrinsically related to the ability to receive a free appropriate public education. Even if one accepts the argument that denying disabled students access to the summer school program is only denying access to one of several methods of obtaining promotion, such a denial would result in the foreclosure of the best if not only way for these students to be promoted.[18]

The explicit purpose of the summer program is to better enable struggling students to meet the new promotional standards. This purpose echoes the Supreme Court's statements concerning those educational services that must be made available to children with disabilities under the IDEA:

> When the language of the Act [19] and its legislative history are considered together, the requirements imposed by

Congress become tolerably clear. Insofar as a State is required to provide a handicapped child with a "free appropriate public education," we hold that it satisfies this requirement by providing personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction. Such instruction and services must be provided at public expense, must meet the State's educational standards, must approximate the grade levels used in the State's regular education, and must comport with the child's IEP. In addition, the IEP, and therefore the personalized instruction, should be formulated in accordance with the requirements of the Act and, if the child is being educated in the regular classrooms of the public education system, should be reasonably calculated *to enable the child to achieve passing marks and advance from grade to grade.*

*Rowley*, 458 U.S. at 203–04, 102 S.Ct. 3034 (emphasis added).

Defendants contend that they should not be required to comply with IDEA and A–445 on a provisional basis because they do not retain sufficient personnel during the summer. Defendants note that a manifestation review requires the participation of a disabled student's entire IEP team, which includes the child's regular education teacher and special education teacher, *see* 34 C.F.R. § 300.344—employees likely to be on vacation during the summer months. In addition, defendants argue:

> If the Court imposes the manifestation review requirement on Defendants and they cannot comply because of the ina-

---

**18.** Removal based on a manifestation of a child's disability would also be in violation of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, which prohibits schools from excluding children from academic *or nonacademic programs* for reasons related to their disabilities.

**19.** The Supreme Court here refers to the precursor of the IDEA, the Education of the Handicapped Act. The 1990 amendments sub-

stituted "Individuals with Disabilities Education Act" for "Education of the Handicapped Act." *See* Pub.L. No. 101–476, § 901(a)(1), 104 Stat. 1103, 1141–42 (1990), codified at 20 U.S.C. § 1400(a). The IDEA provisions provide more extensive protections to students with disabilities, and cases construing the EHA are still frequently cited in opinions under the IDEA.

bility to require a student's teacher to work over the Summer, then Defendants would be unable to suspend any student with a disability, suspected of having a disability, or any student whose parent claims the student has a disability the moment he is disciplined. 34 C.F.R. § 300.527.... This would have a serious impact on the ability of the school system to maintain a safe environment in which all children participating in the Summer Program would have an ability to learn.

(Defs.' Mem. in Opp. at 14.) These logistical problems, however, cannot relieve the Board entirely of its statutory duties under IDEA. If this Court were to hold otherwise, the entire protective framework of IDEA could be eviscerated by an "administrative convenience" argument.[20] *See, e.g., Cedar Rapids Community School Dist. v. Garret F.*, 526 U.S. 66, 76–77, 119 S.Ct. 992, 143 L.Ed.2d 154 (1999).

The situation is not, however, so bleak as defendants portray it. A centralized hearing and oversight board that fully complies with the strictures of A–445 is currently in place and fully staffed to meet the year-round requirements of District 75. Moreover, a Freedom of Information Law request by plaintiffs has revealed that, during the 1998–1999 school year, out of approximately 160,000 children with disabilities only 79 disciplinary cases were even referred for the intensive manifestation determination reviews. (Hyman Reply Decl. ¶ & Ex. A.) Plaintiffs also note that IEP reviews with the IEP teams are routinely performed during the summer in order to comply with the court-ordered requirement that all IEP recommendations for the upcoming school year must be completed by August 15 each year. *See Jose P. v. Mills*, No. CV–79–270, –560 & –2562 (E.D.N.Y.) (EHN); (Hyman Reply Decl. ¶ 7).

Finally, plaintiffs stated at oral argument that removals of more than ten days or expulsions were their real concern and conceded that compliance with the procedural safeguards in IDEA, rather than the more extensive prophylactics in A–445, would suffice for the purposes of preliminary relief. Defendants have recognized that special education teachers faced with a situation in which one of their children faces expulsion will in all likelihood appear voluntarily in person or by telephone to participate in any crucial review of the decision to remove or expel. If not, appropriate substitutes will be permitted.

## CONCLUSION

For the reasons set forth above, plaintiffs' application for a preliminary injunction is granted in accordance with the separate order filed herewith.

Plaintiffs have requested that they not be forced to post a security for the payment of such costs and damages as may be incurred or suffered by defendants if they are found to have been wrongfully enjoined or restrained. As defendants have not opposed this request, and since this case involves the enforcement of "public interests" arising out of "comprehensive federal health and welfare statutes," *Pharmaceutical Soc'y of State of New York, Inc. v. New York Dep't of Social Servs.*, 50 F.3d 1168, 1174 (2d Cir.1995), the Court hereby waives the bond requirement of Fed.R.Civ.P. 65(c).

The Clerk is directed to furnish a filed copy of the within to all parties and to the magistrate judge.

SO ORDERED.

---

**20.** I find similarly unavailing defendants' proffer of these logistical problems as evidence that Congress and the Board did not intend IDEA and A–445 to apply in the context of summer school.