Matter of Elmira City Sch. Dist. v New York State Educ. Dept. (2022 NY Slip Op 02325)

Matter of Elmira City Sch. Dist. v New York State Educ. Dept.

2022 NY Slip Op 02325

Decided on April 7, 2022

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:April 7, 2022

533020
[*1]In the Matter of Elmira City School District, Appellant,
v
New York State Education Department et al., Respondents, and Carolyn K., as Parent of E.K., an Infant, Respondent.

Calendar Date:February 17, 2022

Before:Garry, P.J., Lynch, Pritzker, Colangelo and McShan, JJ.

Law Firm of Frank W. Miller PLLC, East Syracuse (Charles C. Spagnoli of counsel), for appellant.
McNelis Law PLLC, Getzville (Patrick M. McNelis of counsel), for Carolyn K., respondent.

Lynch, J.
Appeal from a judgment of the Supreme Court (Corcoran, J.), entered January 11, 2021 in Albany County, which dismissed petitioner's application, in a proceeding pursuant to CPLR article 4 and Education Law § 4404 (3) (a), to review a determination of a State Review Officer of respondent State Education Department finding that petitioner denied the subject student a free appropriate public education and was entitled to compensatory educational services.
Respondent Carolyn K. (hereinafter respondent) is the mother of E.K. (hereinafter the child; born in 2013) — a child with extensive medical issues who is nonverbal and not ambulatory. The child requires a multitude of services, including speech therapy, occupational therapy, physical therapy, vision therapy and skilled nursing services. One of her medical conditions causes mucous to accumulate in her throat and presents a danger for asphyxiation without proper suctioning. The record indicates that to address this concern, the child requires the care of a registered nurse (hereinafter RN) on a one-to-one basis at school.
During the 2017-2018 school year, the child was enrolled in a prekindergarten program at one of petitioner's schools, which she attended three days per week. She was placed in a general education classroom, attended morning sessions and had a one-on-one private nurse through Medicaid. For the 2018-2019 school year, the child was enrolled in a special education kindergarten program run by the Greater Southern Tier BOCES, where she was assigned a one-on-one RN (hereinafter the BOCES nurse) to assist her. As it turns out, the child attended the BOCES program on one day in September 2018 and did not return for the balance of the school year. That day, respondent raised a concern as to whether the BOCES nurse could properly perform a nasal tracheal suctioning procedure.[FN1] After respondent demonstrated the procedure, the BOCES nurse did the same. Respondent, however, felt that the method utilized by the BOCES nurse was improper. At that point, respondent informed the BOCES staff that she would not feel comfortable allowing the child to attend school until the BOCES nurse received specific suctioning training. The BOCES staff understood this to mean that the child would not return until the training was completed.
Around that same time, a meeting was held with respondent, BOCES staff and petitioner's representatives to discuss concerns raised about a "Physicians Order and Treatment Plan" provided by respondent. In particular, the BOCES nurse identified medication discrepancies within the care plan and raised a concern that the document had been altered. The BOCES nurse advised that she was unable to provide care for the child until the discrepancies were resolved. Both the BOCES director of special education, Stacy Saglibene, and petitioner's assistant supervisor of special education, Suzanne Comstock, testified that respondent admitted altering the document. For her part[*2], respondent explained that the document "was used for private duty nursing at home," but otherwise did not address whether the document had been altered. As a result, BOCES officials determined that the child could not attend their program until they received a corrected plan. A corrected care plan was finalized in or around December 11, 2018, but respondent opted not to send the child to school because the BOCES nurse had yet to receive the additional suctioning training. Efforts by petitioner to obtain further training for the BOCES nurse were unsuccessful.
In early February 2019, the BOCES nurse resigned from her position. The child was then discharged from the BOCES program. At that point, petitioner began related services at a different elementary school building with respondent providing medical care during the child's therapy sessions. Petitioner was ultimately unsuccessful in obtaining a one-to-one RN for the child. As a result, the child did not attend school for the balance of the school year. In March 2019, an annual review meeting was held by a Committee on Special Education (see Education Law § 4402 [1] [b] [1]) to assess the child's educational needs. Although respondent accepted certain of the recommendations made for the child's individualized education program (hereinafter IEP), she disagreed with recommendations for home schooling, home instruction or residential placement. Following the meeting, petitioner notified respondent that it was pursuing enrollment in a residential program, emphasizing that the local BOCES program was unable to meet the child's needs and petitioner could not secure a one-to-one RN to provide her with services.
Respondent thereafter filed a complaint under the Individuals with Disabilities Education Act (see 20 USC § 1400 et seq. [hereinafter IDEA]), alleging that petitioner failed to provide the child with a free appropriate public education (hereinafter FAPE) (see Education Law § 4404 [1] [a]; 8 NYCRR 200.5 [i] [1]). In that respect, respondent asserted that petitioner failed to provide services tailored to meet the child's needs during the 2018-2019 school year, and its proposal to place the child in a residential program was "overly restrictive," as the child benefitted from being in a classroom with peers and was able to meaningfully participate when provided with appropriate services.
A hearing was held before an impartial hearing officer (hereinafter IHO), who found that petitioner did not deny the child a FAPE. To that end, the IHO determined that the failure of the child to receive her IEP from September 2018 to February 2019 was attributable "directly and solely . . . to [respondent's] improper conduct in altering [the child's] [p]hysician's care plans and . . . refusal to send [the child] to receive her program at BOCES until her demands that [the BOCES nurse] receive additional training in suctioning [were met]." For the period from February 2019 onward, the IHO believed that [*3]petitioner was in a "[c]atch 22" situation because it could only implement the child's IEP if it could hire an RN to provide services, but was unsuccessful in locating a candidate who was willing to accept the position. Characterizing the situation as presenting an "[i]mpossibility of [p]erformance" defense, the IHO declined to find that petitioner was liable in failing to provide the child with her IEP during that time frame. Although the IHO expressed reservations about placing the child in a residential program, he ultimately determined that petitioner had no other option but to seek such a placement given that it was unable to locate a one-to-one RN.
Upon respondent's administrative appeal, a State Review Officer (hereinafter SRO) for respondent State Education Department reversed several of the IHO's findings, concluding that petitioner failed to offer the child a FAPE between the periods of September 2018 to December 2018, and February 2019 to June 2019. In light of that finding, the SRO remanded the matter to the IHO "for further development of the hearing record and a determination with respect to an appropriate award of compensatory education services for the [child] for those time frames." As for the period between September 2018 and December 2018, the SRO found that, although "it was reasonable for the BOCES nurses to not provide services to [the child] until they received a corrected [care] plan [from the child's doctor], [petitioner] should have taken measures to obtain a corrected plan instead of relying on [respondent] and her care coordinator and waiting almost two months for the correct paperwork." Accordingly, the SRO found that petitioner was responsible for the child not receiving educational services from September 2018 to December 2018.
With respect to the period between December 2018 and February 2019, the SRO essentially affirmed the IHO's finding that petitioner was not responsible for the failure to implement the child's IEP during this time. In that respect, the SRO concluded that respondent's concerns about the BOCES nurse requiring additional training in suctioning were unfounded and that the evidence "support[ed] a finding that . . . [petitioner] had the capacity to implement the student's IEP between December 2018 and February 2019."
As for the period between February 2019 and June 2019, the SRO determined that there was minimal evidence supporting petitioner's contention that respondent's actions caused the BOCES nurse to resign and, aside from the request for suctioning training, there was no evidence that respondent placed unreasonable demands on the BOCES nurse or BOCES staff. The SRO further rejected the impossibility of performance defense, noting that defense was specific to contract law and did not excuse petitioner's statutory responsibility to implement the child's IEP. Therefore, the SRO reasoned, petitioner's inability to secure an RN who could provide one-to-one services for the child resulted [*4]in a material deviation from the IEP so as to constitute a denial of a FAPE during this period. Finally, the SRO vehemently disagreed with the plan to place the child in a residential program. Petitioner thereafter commenced this proceeding pursuant to CPLR article 4 and Education Law § 4404 (3) (b) seeking annulment of the SRO's determination. Supreme Court dismissed the petition, and petitioner appeals.
The IDEA "offers [s]tates federal funds to assist in educating children with disabilities" (Endrew F. ex rel. Joseph F. v Douglas County School Dist. RE-1, ___ US ___, ___, 137 S Ct 988, 993 [2017]). In exchange, "a [s]tate pledges to comply with a number of statutory conditions," including an obligation to "provide a . . . FAPE . . . to all eligible children" (id. at 993). Pertinent here, that obligation requires petitioner to provide the child with special education and related services in accord with the child's IEP (see id. at 994). To assure substantive compliance with the IDEA, "a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances" (id. at 999). In New York, this responsibility is codified in Education Law § 4402 et seq., which requires every school district to provide "'suitable educational opportunities for [students with disabilities]' based upon the needs of the individual child" (Matter of Board of Educ. of Bay Shore Union Free School Dist. v Thomas K., 14 NY3d 289, 293 [2010], quoting Education Law § 4402 [2] [a]).
The denial of a FAPE may be established through a deficient IEP or by the failure to comply with certain procedural safeguards set forth in the IDEA. However, "[n]ot every violation of these procedural safeguards rises to the level of the denial of a FAPE. Rather, the violations must 'significantly impede' the parents' participation rights, 'impede the child's right to a FAPE,' or 'cause a deprivation of educational benefits'" (T.K. v New York City Dept. of Educ., 810 F3d 869, 875 [2d Cir 2016] [internal brackets omitted], quoting 20 USC § 1415 [f] [3] [E] [ii]). In fashioning relief under the IDEA, "equitable considerations are relevant" (Florence County School Dist. Four v Carter By & Through Carter, 510 US 7, 16 [1993]).
The filing of a complaint under Education Law § 4404 triggers a two-tiered administrative review procedure in which, as was implemented here, the matter is heard before an IHO and, if appealed, reviewed by an SRO (see Education Law § 4404 [1] [c]; Hardison v Board of Educ. of the Oneonta City School Dist., 773 F3d 372, 376 [2d Cir 2014]). During the impartial hearing, the burden of proof and persuasion remains with the school district to establish the validity of its plan (see Education Law § 4404 [1] [c]; see generally R.E. v New York City Dept. of Educ., 694 F3d 167, 184 [2d Cir 2012], cert denied 569 US 1030 [2013]). An SRO may modify the decision of the IHO at the second step "to the extent that the [SRO[*5]] deems necessary" (Education Law § 4404 [2]). If the SRO's decision is challenged in Supreme Court pursuant to CPLR article 4, "[t]he court shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and[,] basing its decision on the preponderance of the evidence, shall grant the relief that the court determines to be appropriate" (Education Law § 4404 [3] [b] [emphasis added]; see Hardison v Board of Educ. of the Oneonta City School Dist., 773 F3d at 385).[FN2]
On the merits, we first emphasize that no challenge has been made to the SRO's determination that respondent was not denied a FAPE during the second period from December 2018 to February 2019, i.e., the period between the update of the physician's care plan and the resignation of the BOCES nurse. Here, the SRO concluded that petitioner demonstrated that the BOCES nurse was qualified to perform the required suctioning procedure and that petitioner was able to implement the student's IEP. In this regard, the SRO noted that the BOCES nurse was adamant that she was so qualified and the school's physician agreed.
Although the SRO found otherwise, we find this determination as to the BOCES nurse's qualifications relevant to the assessment of whether petitioner failed to provide a FAPE during the first period — i.e., September 2018 to mid-December 2018. As recounted above, both the care plan and suctioning issues arose around the same time. In resolving this dispute, it is essential to recognize that neither of these issues pertains to the components or adequacy of the IEP, but relate to the implementation of the IEP. With respect to the care plan, we agree with the SRO that the BOCES nurse reasonably declined to provide care until an updated, valid plan was in place. We also recognize that petitioner was in a position to directly reach out to the child's medical provider to address the discrepancies in the care plan (see Guidelines for Medication Management in Schools, New York State Education Department, at 14 [Dec. 2017], available at https://www.p12.nysed.gov/sss/
documents/MedicationManagement-DEC2017.pdf ["If a school has concerns or questions regarding a provider's order (to administer medication to a student), the school's medical director or school nurse should call the provider to resolve concerns and/or clarify the order"]). Under the circumstances presented, however, we disagree with the SRO's assignment of fault to petitioner for not taking the lead in securing the updated plan.
During the hearing, respondent's care manager, Shannon Carey, testified that she worked for SKIP of New York, a nonprofit organization that assists families who have children with medical and developmental disabilities. Carey was at the September 2018 meeting involving the care plan. She explained that petitioner utilized a specific form for physician orders that listed a student's medication, and she "offered to get those forms for the school [*6]and [respondent]." All participants accepted that offer. In this regard, it is important to emphasize that respondent objected to the BOCES nurse's request to communicate directly with the physicians herself. Carey proceeded to communicate with the child's relevant providers — the primary care physician, neurologist, orthopedist and endocrinologist. The responses, which included "physician orders for giving medication in school" signed on November 1, 2018, were then reviewed with the BOCES nurse. In a December 3, 2018 note, the BOCES nurse explained that the orders were "PRN (as needed) medication orders" and that additional orders were required. The care plan was finalized on December 11, 2018. During this period, the SRO noted that the BOCES nurse and respondent "had a back and forth dialogue about what was missing and what needed to be in place directly from a doctor."
Given this scenario, the record does not support the SRO's conclusion that petitioner's failure to directly contact the physicians caused the delay in finalizing an acceptable care plan. There is no suggestion that Carey unduly delayed in her efforts or that the parties failed to maintain a working dialogue to resolve the issue — an issue that was precipitated by respondent's presentation of an altered care plan. Not to be overlooked is that all the while respondent had determined not to return the child to school until the BOCES nurse received the suctioning training. Given these circumstances, we conclude that petitioner demonstrated that it did not significantly impede the child's right to a FAPE during the September 2018 to December 2018 period.
We conclude, however, that the SRO properly determined that the child was denied a FAPE between February 2019 and June 2019. To that end, the child's IEP from March 2019 highlighted that she "requires 1:1 supervision from a nurse for suctioning, feeding, transfers, toileting, and overall care" (see 20 USC § 1401 [26] [a] [including within the definition of "related services" are "school nurse services designed to enable a child with a disability to receive a (FAPE) as described in the (IEP) of the child"]). Despite such need, the BOCES nurse resigned from her position in February 2019 and petitioner was unable to secure another one-to-one RN for the child, resulting in her being unable to attend her educational program between February 2019 and June 2019.
The record supports the SRO's conclusion that respondent's actions did not cause the BOCES nurse to resign.[FN3] Although there was testimony that petitioner posted job openings for the position and took other steps to find a replacement, an impossibility of performance defense is generally at odds with the purpose of the IDEA, which is "'to assure that the rights of handicapped children and their parents or guardians are protected'" (School Committee of Town of Burlington, Mass. v Department of Educ. of Mass., 471 US 359, 367 [1985], quoting 20 USC § 1400 [c]; see Brown [*7]v District of Columbia, 2019 WL 34 23208, *16-17, 2019 US Dist LEXIS 130692, *44-46 [D DC, July 8, 2019, 17-cv-00348 (RDM/GMH)] [impossibility of performance defense did not relieve the school district of its obligation to provide a FAPE]; McDowell v District of Columbia, 2019 US Dist LEXIS 189605, *16-19 [D DC, Nov. 1, 2019, 18-cv-1382 (KBJ/DAR) [same]). While there may be situations where the failure to provide a FAPE should be excused (see e.g. Hester v District of Columbia, 505 F3d 1283, 1286 [DC Cir 2007] [excusing the failure to provide a FAPE based upon contract principles where there was a settlement agreement — i.e., a contract — between the child and district and a situation arose that made performance impracticable]), petitioner has not shown that this was one of them (see LIH ex rel. LH v New York City Bd. of Educ., 103 F Supp 2d 658, 670-671 [ED NY 2000] [rejecting the defendants' contention that "they should not be required to comply with the IDEA . . . on a provisional basis because they do not retain sufficient personnel during the summer" to enable the children to participate in a summer school program]).[FN4] Indeed the IDEA contains specific situations in which "[t]he obligation to make a [FAPE] available to all children with disabilities does not apply" and the inability to secure needed services is not included in that list (20 USC § 1412 [a] [1] [B]). In any event, even if an impossibility of performance defense did apply in this circumstance, petitioner has not made the requisite showing, as it has not demonstrated that the inability to hire a one-to-one RN was "objectively impossible" (Kel Kim Corp. v Central Mkts., Inc., 70 NY2d 900, 902 [1987]; see also McDowell v District of Columbia, 2019 US Dist LEXIS at *16-19).
As for the SRO's finding that a residential placement was not appropriate, the IDEA expressly provides that "state[s] must . . . ensure that 'to the maximum extent appropriate,' children with disabilities . . . are educated with children who are not disabled'" (T.M. ex rel. A.M. v Cornwall Cent. School Dist., 752 F3d 145, 151 [2d Cir 2014] [internal brackets omitted], quoting 20 USC § 1412 [a] [5] [A]). Residential placement must be based upon the child's actual needs in accordance with an IEP, not upon administrative convenience (see 34 CFR 300.116 [b] [2]). The record demonstrates that the child was receiving a meaningful benefit from being educated around peers. Indeed, the child's IEP from March 2019 confirmed that she "appears to enjoy being able to interact with her peers" and "needs to be included with students that will engage her socially and to encourage her to greet them." There was also hearing testimony to this effect. As such, we will not disturb the SRO's finding that the residential placement recommendation, which was largely premised upon the inability to hire a one-to-one RN rather than the child's needs, was inappropriate at the time that it was made (see 34 CFR 300.116 [b] [2]; Adams [*8]v State of Oregon, 195 F3d 1141, 1151 [9th Cir 1999]) and that compensatory services are owed.
Garry, P.J., Pritzker, Colangelo and McShan, JJ., concur.
ORDERED that the judgment is modified, on the law, without costs, by vacating so much thereof as determined that petitioner denied the student a free appropriate public education during the period of September 2018 to December 2018, and, as so modified, affirmed.

Footnotes

Footnote 1: Respondent was trained as a licensed practical nurse, but clarified that she needed to renew her license as of the time of the hearing.

Footnote 2: Neither party requested an opportunity to submit additional evidence to either the SRO or Supreme Court.

Footnote 3: In any event, "the IDEA was passed for the purpose of protecting disabled children, not the jobs of school employees. Though the risk of staff leaving is regrettable, this factor can not detract from pursuit of the purpose of a congressional statute that seeks to help disabled children by creating a system of rights for their parents, even hostile parents, to advocate on their behalf" (Lillbask ex rel. Mauclaire v Sergi, 117 F Supp 2d 182, 200 [D Conn 2000]). Stated differently, "educational agencies cannot excuse their failure to satisfy the IDEA's procedural requirements by blaming the parents" (Anchorage School Dist. v M.P., 689 F3d 1047, 1055 [9th Cir 2012]), as "[p]arents are entitled to advocate fiercely, even overzealously, on behalf of their disabled children's interests" (A. v Greenwich Bd. of Educ., 2016 WL 39 51052, *21, 2016 US Dist LEXIS 94431, *66 [D Conn, July 20, 2016, No. 15-CV-00203 (CSH)]).

Footnote 4: Petitioner relies on guidance documents promulgated by the Education Department in response to the COVID-19 pandemic concerning services to public school students with disabilities, contending that they support the proposition that an IEP need not be strictly followed when unfeasible or unsafe. This argument misses the mark, as the child's inability to attend school between February 2019 and June 2019 did not stem from the pandemic, and the purported inability to hire a one-to-one RN for the child can hardly be analogized to the extraordinary circumstances presented by the pandemic.